The SUPERIOR OIL COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

MITCHELL ENERGY CORPORATION, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

Nos. 76–2113, 76–2246.

United States Court of Appeals, Fifth Circuit.

Nov. 17, 1977.

W. B. Wagner, Jr., Pat F. Timmons, James M. Dunnam, Houston, Tex., for petitioner in No. 76–2113.

Homer J. Penn, Mitchell Energy Corp., Houston, Tex., for petitioner in No. 76–2246.

Allan Abbott Tuttle, Sol., Federal Power Commission, Drexel D. Journey, Gen. Counsel, Washington, D. C., for respondent.

Before CLARK, RONEY and TJOFLAT, Circuit Judges.

CHARLES CLARK, Circuit Judge:

This case arises out of petitions requesting preenforcement judicial review of two orders issued by the Federal Power Commission [FPC]. If sustained, the orders [1] would require all large producers of natural gas and their affiliates to submit detailed information concerning their exploration and development-related expenditures and activities to the FPC on an annual basis. The petitioners, the Superior Oil Company [Superior] and the Mitchell Energy Corporation [Mitchell], are large producers of natural gas and other petroleum products who would be obliged to complete and file a questionnaire known as Form 64 should the orders be upheld. They contend that the orders are invalid for the following reasons: (1) to the extent that they require submission of information from affiliates of natural gas companies who are not themselves natural gas companies, they exceed the bounds of the FPC's powers under the Natural Gas Act; (2) the administrative determination on which they are based—that the regulatory need for the data outweighs the burden which compliance` would impose on the petitioner—is not supported by substantial record evidence; (3) the orders violate the Freedom of Information Act insofar as they authorize the disclosure of the confidential data to be collected on Form 64; (4) the orders violate the Federal Reporting Services Act because the FPC has announced its intention not to comply with

---

1. Order No. 543, entitled *Order Requiring the Reporting of Producer Expenditures, Exploration and Development Activity, Production, Re-* *serve Additions and Revenues* (issued December 10, 1975); Order No. 543–A, entitled *Order Denying Rehearing* (issued April 19, 1976).

the Act and because Form 64 is burdensome and requires the submission of data already available in reports submitted to other federal agencies. With one modification, we reject these contentions.

## I. Procedural and Factual Background

During the past decade considerable concern has been voiced over the FPC's dependence upon summaries prepared by natural gas producers themselves (through their trade association, the American Gas Association) for the information necessary to effective regulation of their pricing and interstate sale of natural gas.[2] Form 64 was adopted as one of three new data collection instruments designed to furnish the FPC with an independent source of raw data upon which its ratemaking and evaluation of established rates would be based.

The first two acts of the scenario, Form 40 [3] (information concerning natural gas reserves) and Form 45 [4] (information concerning intrastate sales of natural gas) opened to mixed judicial reviews. While we affirmed the FPC's adoption of Form 45 in *Continental Oil Co. v. Federal Power Commission*, 519 F.2d 31 (5th Cir. 1975), *cert. denied sub nom. Superior Oil Co. v. FPC*, 425 U.S. 971, 96 S.Ct. 2168, 48 L.Ed.2d 794 (1976), the Ninth Circuit set aside the orders adopting Form 40 in *Union Oil Co. of California v. FPC*, 542 F.2d 1036 (9th Cir. 1976). Today we review the finale.

On March 21, 1975, the FPC published a "Notice of Proposed Rulemaking," [5] announcing that it was considering the adoption of a new rule that would require every natural-gas company [6] and its affiliates [7] to file Form 64, and invited interested

2. *See, e. g.,* Halverson, An Analysis of the Oil and Natural Gas Reserve Reporting Problem: The Government's Need to Know versus the Private Company's Need to Protect the Confidentiality of its Sensitive Business Information, 27th Annual Institute on Oil and Gas Law 119, 121–23 & 130–31 (1976); Letter of April 2, 1975 from Lee Metcalf, Chairman of the Senate Subcommittee on Reports Accounting and Management, to Mary B. Kidal, Acting Secretary of the Federal Power Commission (comment submitted in response to the FPC's notice of proposed rule making pertaining to Form 64).

3. Form 40 was promulgated by the following orders: Order No. 526, entitled *Natural Gas Companies Annual Report of Proved Domestic Gas Reserves: FPC Form No. 40* (issued February 25, 1975); Order No. 526–A denying rehearing.

4. Form 45 was promulgated by the following orders: Order No. 521, entitled *Order Establishing Data Collection System to Investigate Rates Charged for Nonjurisdictional Sales of Natural Gas by Natural Gas Companies Subject to the Jurisdiction of the Federal Power Commission* (issued January 9, 1975); Order No. 521–A, entitled *Order Denying Stay and Maintaining Non-Public Status of Data Pending Rehearing* (issued February 19, 1975); and Order No. 521–B, entitled *Order Clarifying Order No. 521* and *Denying Rehearing* (issued March 17, 1975.)

5. 40 Fed.Reg. 12817 (1975).

6. Section 2(6) of the Natural Gas Act, 15 U.S. C.A. § 717a(6) (1976), defines a "Natural-gas company" as

a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale.

7. 18 C.F.R. § 157.40(a)(2) (1977) provides:
 "Affiliated producers" are persons who, directly or indirectly, control, or are controlled by, or are under common control with, the applicant producer. Such control exists if the producer has the power to direct or cause the direction of, or as a matter of actual practice does direct, the management and policies of another producer, whether such power is exercised alone or through one or more intermediary companies, or pursuant to an agreement, and whether such power or practice is established through a majority or minority ownership or voting of securities, common directors, officers or stockholders, voting trusts, holding trusts, associated companies, relationship of blood or marriage, or any other direct or indirect means. For the further purposes of this section, the term "agreement" shall not include any agreement for the operation of a natural gas producing property or a plant processing natural gas or any joint venture, partnership, nominee, or other type of agreement pertaining to the joint exploration for and development and operation of oil and gas properties, unless such agreement otherwise establishes the power of one producer to direct or cause the direction of the management and policy of another producer. Also, for the further purposes of this section, the existence of one or more directors of an applicant producer in common with another producer shall be deemed a conclusive presumption of affiliation and control.

persons to submit written comments concerning the suggested rule. As originally proposed, Form 64 consisted of three schedules: Schedule No. 1 requested total expenditures incurred for exploration and development of oil and gas by type of reservoir; Schedule No. 2 sought information concerning exploration and development activities; and Schedule No. 3 asked for production, revenue, royalty, and non-associated gas reserve data. Each schedule required that the requested information be submitted on both a national and a production-area basis.

Many comments were submitted in response to the Commission's March notice. Many respondents requested additional time for the preparation of more detailed comments and asked that a conference between natural gas producers and the FPC's staff be held immediately. The FPC then issued an order entitled "Notice of Extension of Time for Comments and Denying Motion for Conference" on April 23, 1975. The ruling expanded the period during which comments concerning proposed Form 64 would be received from 30 to 60 days but denied the producers' request for a pre-comment conference on the grounds that holding a conference would substantially alter the announced procedures for adopting Form 64 and would not be "beneficial." By the time the period for the filing of comments had expired, more than 50 natural gas producers had expressed their views on the merits of the proposed Form 64. The comments were overwhelmingly critical. The producers objected to Form 64 on the grounds, among others, that it was duplicative, burdensome, required the submission of unavailable data, and failed to provide that the information submitted would be kept confidential and that both the questionnaire and the directions accompanying it were unclear.

In Order No. 543, the FPC responded to many, but not all, of the objections raised in the comments submitted by producers. While rejecting or not discussing some suggestions, the FPC did modify Form 64 in several significant ways that will be discussed in detail later. Petitions for rehearing followed. The FPC considered the additional objections raised on rehearing and altered its previously announced policy concerning the confidentiality of the data to be collected by Form 64. Order No. 543–A denied the petitions for rehearing and directed all natural gas companies and their affiliates to file Form 64 by June 11, 1976. The petitioners appealed, and we stayed enforcement of Orders Nos. 543 and 543–A pending judicial review.

## II. Validity of the Reporting Requirement

■ Since Congress has expressly delegated rule making authority to the FPC,[8] the rules which it issues are legislative in nature. *See* 1 K. Davis, Administrative Law Treatise § 5.03, at 299 (1958).[9] Therefore, they possess the force and effect of law if they are "(a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable." *Continental Equities, Inc. v. Commissioner of Internal Revenue,* 551 F.2d 74, 82 (5th Cir. 1977), *quoting* 1 K. Davis, Administrative Law Treatise § 5.03, at 299 (1958), *and* K. Davis, Administrative Law of the Seventies § 29.-01–1, at 654 (1976) (supplementing 1958 Treatise); *cf. Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–17, 91 S.Ct. 814, 823, 28 L.Ed.2d 136, 153–54 (1971) (nonformalized decision making). This principle supplies the structure for our discussion of the validity of the reporting requirements imposed by Orders 543 & 543–A.

### A. Within the Granted Power

The petitioners do not challenge the FPC's authority to promulgate rules requir-

---

8. Section 16 of the Natural Gas Act, 15 U.S.C.A. § 717*o* (1976), provides in part:

 The Commission shall have the power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter.

9. Counsel for Superior conceded as much during oral argument. Of course, the FPC also is at liberty to issue interpretative rules. But that is clearly not what was intended here.

ing them to furnish it with information concerning their production, transportation, and disposition of natural gas. The existence of that general power is conclusively established by the Act.[10] Instead, they contend that the FPC exceeded its statutory power in issuing the orders under attack to the extent that they require entities that are "affiliated producers" of natural gas company gas that term is defined in 18 C.F.R. § 157.40(a)(2) (1977), but not themselves "natural gas companies" as that term is defined by Section 2 of the Natural Gas Act, 15 U.S.C.A. § 717a(6) (1976), to complete Form 64. In *Continental Oil,* we held that the FPC could compel entities that were natural gas companies within the meaning of the Act to report information concerning their non-regulatable intrastate sales. *See* 519 F.2d at 33–34; *see also Union Oil Co. of California v. FPC, supra,* 542 F.2d at 1038–39. The question here is whether the FPC may go further and (a) require statutory natural gas companies to report information concerning the expenditures of affiliates whom they control, or (b) require the affiliates themselves to complete and file Form 64.[11]

■ As the Supreme Court stated in *Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana,* 332 U.S. 507, 516, 68 S.Ct. 190, 195, 92 L.Ed. 128, 137 (1947):

Three things and three only Congress drew within its own regulatory power delegated by the Act to its agent, the Federal Power Commission. These were: (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale.

*See also FPC v. Louisiana Power & Light Co.,* 406 U.S. 621, 636, 92 S.Ct. 1827, 1836, 32 L.Ed.2d 369, 382 (1972). In addition to whatever power may be derived from category (3), category (2) grants the FPC jurisdiction to require submission of expenditure data pertaining to the operations of affiliates controlled by statutory natural gas companies whether it seeks such data from the statutory natural gas companies or from the affiliates themselves.

■ The congressional delegation of power to regulate the interstate sale of natural gas for resale has long been held to encompass the power to fix the price at which such sales shall be made.[12] For effective and meaningful price regulation, the FPC must be able to insure the integrity of its information about producer expenditures for exploration and development which are critical components of cost and essential for determining a just and reasonable rate. The FPC argues that without exploration and development expenditure data of affiliates controlled by statutory natural gas companies, accurate analysis of production costs would be impossible, because transfers of property between affiliates might result in interstate sales being made from higher-cost properties and intrastate sales from lower-cost properties. This would distort the true cost of production for interstate sales and mislead the FPC in setting a proper national rate. The princi-

---

10. *See* note 8 *supra.* Section 16 further provides:

> Among other things, such rules and regulations . . . may prescribe the form or forms of all . . . reports to be filed with the Commission, the information which they shall contain, and the time within which they shall be filed.

15 U.S.C.A. § 717*o* (1976).

11. It is unclear whether the FPC intended to require that affiliates file their own questionnaire or merely meant to insist that statutory natural gas companies include data concerning their affiliates in their responses to Form 64. The second sentence of Order 543 reads:

> All persons found by the Commission to be a "natural-gas company" within the meaning of the Natural Gas Act and their jurisdictional affiliates and subsidiaries as defined in 18 C.F.R. § 157.40(a)(2) of the Commission's regulations, except as exempted herein, shall be required to file and attest to the information solicited in the attached report. [Footnote omitted.]

Lacking FPC clarification or construction, we will assume we must reach the broader issue of whether the affiliates themselves can be compelled to furnish the data.

12. *See Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954).

pal aim of the Act was to "protect consumers against exploitation at the hands of natural gas companies." *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 611, 64 S.Ct. 281, 291, 88 L.Ed. 333, 349 (1944). Therefore, if the FPC lacked the power to compel both statutory natural gas companies and their controlled affiliates to disclose the affiliates' exploration and development expenditures, it would be unable to prevent the artificial shifting of properties among affiliates and powerless to accomplish the primary purposes of the Act. As we explained in *Continental Oil,* when information is "essential to effective ratemaking," the FPC is authorized to procure it. 519 F.2d at 33.

■ Other sections of the Act, while falling short of specifically empowering the FPC to gather from affiliates the information sought by Form 64, support the view that the FPC's investigatory powers are broad and are not limited by the constraints which Congress has placed on the regulatory and rate-setting jurisdiction of the FPC. *See Union Oil Co. of California v. FPC, supra,* 542 F.2d at 1039. For example, section 14(a) of the Act authorizes the FPC to

investigate *any* facts . . . which it may find necessary or proper . . . to aid in the enforcement of the provisions of this chapter or in prescribing rules or regulations thereunder, or in obtaining information to serve as a basis for recommending further legislation to the Congress.

15 U.S.C.A. § 717m(a) (1976) (emphasis added). Similarly, section 5(b), 15 U.S.C.A. § 717d(b), permits the FPC to investigate the costs of producing natural gas even where it lacks the authority to set rates. Moreover, section 8 provides that

The books, accounts, memoranda, and records of any person who controls directly or indirectly a natural-gas company

subject to the jurisdiction of the Commission *and of any other company controlled by such person,* insofar as they relate to transactions with or the business of such natural-gas company, shall be subject to examination on the order of the Commission.

15 U.S.C.A. § 717g(c) (1976) (emphasis added).

■ Mitchell contends that 15 C.F.R. § 157.40(a)(2) (1976) furnishes an improper basis for defining affiliates for the purpose of determining who must complete Form 64 because it was originally designed for another purpose. We think this is irrelevant. The regulation defines an affiliate as an entity that is either (a) controlled (in a practical sense) by a natural gas company, or (b) possesses a director in common with a natural gas company (in which case a conclusive presumption of control arises). In our view, the definition of the term "affiliated producer" contained in § 157.40(a)(2) of the regulations is both workable in this context and rationally related to the accomplishment of the purposes which the affiliate filing requirement of Order No. 543 is designed to serve. We find the FPC acted within the power granted to it in promulgating Form 64.

B. Issued Pursuant to Proper Procedure

Superior and Mitchell contest the procedure by which the FPC adopted Form 64 promulgating Orders No. 543 and No. 543A. We find that the FPC, in promulgating Form 64, satisfied both the Administrative Procedure Act and the relevant provisions of the Natural Gas Act.

■ Superior and Mitchell do not challenge the FPC's compliance with the informal rule making provisions set forth in section 4 of the APA.[13] 5 U.S.C.A. § 553 (1967). Rather, they maintain that, because

13. Section 553 requires that an agency (1) publish notice of the proposed rule making in the Federal Register unless all persons who might be affected by the proposed rule have actual notice of the proceedings, (2) give interested persons an opportunity to participate in the proposed rule making through submission of

written data, views, or arguments with or without oral presentation, (3) accompany any rules that are adopted by a concise general statement of their basis and purpose, and (4) afford interested persons the right to petition for the amendment or retraction of any rules that are adopted. 5 U.S.C. § 553 (1967).

section 19(b) of the Natural Gas Act adopts a substantial evidence test for the factual components of an FPC order,[14] this court must require the FPC to implement additional fact-finding procedures that can produce a record able to withstand a stricter scrutiny than courts give an informal rule making proceeding governed solely by the APA. We do not agree.[15]

A court reviewing informal rule making under section 10(e) of the APA, after determining that the agency acted within the Constitution and its enabling statute, must determine whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.A. § 706(2)(A) (1967). The APA also requires that a substantial evidence standard be applied to adjudications and to actions "reviewed on the record of an agency hearing provided by statute." 5 U.S.C.A. § 706(2)(E) (1967). The Supreme Court has defined the two standards as follows:

> Under the "arbitrary and capricious" standard . . . . [a] reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . . ."

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447, 455 (1974).

Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126, 140 (1938). It is generally accepted that the latter standard allows for "a considerably more generous judicial review" than does the former. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 143, 87 S.Ct. 1507, 1513, 18 L.Ed.2d 681, 688 (1967). However, in *Florida Peach Growers Ass'n v. United States Dep't of Labor,* 489 F.2d 120, 128–29 (5th Cir. 1974), *quoting Associated Indus. of New York State, Inc. v. United States Dep't of Labor,* 487 F.2d 342, 349–50 (2d Cir. 1973), this circuit acknowledged that when applied to informal rule making, the two criteria tend to converge. A respected authority in the field of administrative law agrees.[16]

Whether there be any practical difference in the result of a review under the two concepts, it is clear that an effort to apply the substantial evidence standard to informal rule making is sure to produce awkward results. Difficulties occur because informal rule making does not produce the hearing-type record to which substantial evidence review is customarily applied. *See Florida Peach Growers Ass'n v. United States Dep't of Labor, supra,* 489 F.2d at 128; *Mobil Oil Corp. v. FPC,* 157 U.S.App. D.C. 235, 257, 483 F.2d 1238, 1260 (1973).[17]

---

14. The findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive.
U.S.C.A. § 717r(b) (1976).

15. The argument made by the petitioners is not a new one. At present there is a split among the circuits as to whether it should be accepted. *Compare Mobil Oil Corp. v. FPC,* 157 U.S.App. D.C. 235, 483 F.2d 1238 (1973) and *Union Oil Co. of California v. FPC,* 542 F.2d 1036 (9th Cir. 1976) (accepting the argument); *with Phillips Petroleum Corp. v. FPC,* 475 F.2d 842 (10th Cir. 1973), *cert. denied sub nom., Chevron Oil Co. v. FPC,* 414 U.S. 1146, 94 S.Ct. 901, 39 L.Ed.2d 102 (1974) (contra). In *Union Oil,* the Ninth Circuit states:
> We think . . . that Congress expected greater scrutiny [than that afforded by the arbitrary and capricious test] when the enabling statute contains a substantial evidence test. The mere statement of a rationale by

the agency, without any evidentiary support, does not provide the reviewing court with a record upon which it can determine whether the factual findings are supported by substantial evidence.
542 F.2d at 1041.

16. The answer that the law *should* give to the question whether the substantial evidence "formulas [sic] means broader review, narrower review, or the same scope of review as the "arbitrary or capricious" formula is that such refinements in the words used have no discernible effect upon what courts do.

K. Davis, Administrative Law for the Seventies § 29.01 (1976).

17. *See also City of Chicago v. FPC,* 147 U.S. App.D.C. 312, 325, 458 F.2d 731, 744 (1971) cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972):

■ The scope of review provision in the Natural Gas Act, Section 19(b), provides that "[t]he finding of the Commission *as to the facts,* if supported by substantial evidence, shall be conclusive." 15 U.S.C. § 717r(b) (1976). (Emphasis supplied.) When the Commission is developing rates or making particularized rules which depend upon determinations of fact, Section 19(b) requires that the FPC develop in the record those facts upon which the ultimate decision rests. Then, review must test the substantiality of those facts. This requirement of the Natural Gas Act limits the substantial evidence test to findings of fact. Thus, the statutory approach differs from many others, such as that contained in the Occupational Health and Safety Act, which couples informal rule making power with the requirement that "[t]he determinations of the Secretary shall be conclusive if supported by substantial evidence in the record considered as a whole." 29 U.S.C.A. § 655(f) (1975). *See Florida Peach Growers Ass'n v. United States Dep't of Labor, supra.* Section 19(b) of the Natural Gas Act does not oblige the FPC to develop a record demonstrating that substantial evidence compelled the adoption of policy-based legislative rules unless the process involves findings of fact. The meaning of substantial evidence does not change, but the extent to which the Natural Gas Act's "conclusive" presumption displaces the APA's informal rule making provisions varies with the degree to which FPC action rests upon findings of facts rather than policy decisions within the agency's discretion.

Our analysis of Section 19(b) requires that we reject the approach taken by the Ninth Circuit in *Union Oil v. FPC,* 542 F.2d 1036 (9th Cir. 1976). In *Union Oil,* the Ninth Circuit determined that the FPC acted properly in promulgating Form 40 only if substantial evidence indicated that the agency's need for the information out-

weighed the burden to producers of getting the information and reporting it. Adopting this formulation of a "factual" basis for the FPC's order would require the agency to show not only that substantial evidence supported factual components of agency action, but that it compelled the promulgation of Form 64. This approach, adopted in *Union Oil,* would always subject the FPC's policy decisions to formal fact-finding standards and would constrain its rule making authority contrary to Section 19(b), which does not undertake to supplant APA requirements for broad-based policy decisions.

■ Absent clear and specific congressional requirements, we decline to import into informal rule making those formalities developed for the adjudicatory process and basically unsuited for policy rule making. *See American Airlines, Inc. v. CAB,* 123 U.S.App.D.C. 310, 315, 359 F.2d 624, 629 *cert. denied,* 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966). Not only do we fail to discern a "clear and specific" legislative intention that the FPC employ additional procedures in actions such as these, we see no such intent whatsoever. An agency need not make findings of fact in the conventional sense in a Section 553 proceeding. *Florida Sugar Cane League, Inc. v. Usery,* 531 F.2d 299, 303 (5th Cir. 1976), *quoting General Telephone Co. of the Southwest v. United States,* 449 F.2d 846, 862 (5th Cir. 1971). *See also, United States v. Florida East Coast Railway,* 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973).

■ The promulgation of Form 64 resulted from the FPC's decision that submitting data in the prescribed form would aid the agency in performing its regulatory duties under the Natural Gas Act and would not disproportionately harm producers. At the root of this choice lies not ascertainable fact but a policy decision

The record in [an informal rule making] proceeding ordinarily will contain more generalized than specific information, may not contain information tested by cross-examination and will frequently contain much conclusory information based on data gathered by interested parties. For this reason, application of the substantial evidence test, defined and conceptualized as it frequently is in terms of whether or not a directed verdict should be granted in a jury trial, to findings resulting in [an informal rule making] proceeding would be of scant utility.

about how precise factual data must be for the FPC to determine reasonable rates under a broad statutory mandate.[18] While we do not adopt a single rule for all rule making, we recognize that many legislative judgments cannot be anchored securely and solely in demonstrable fact, *Industrial Union Dep't, AFL–CIO v. Hodgson*, 162 U.S. App.D.C. 331, 340, 499 F.2d 467, 476 (1974), and consequently these policy choices are not susceptible to the same type of verification or refutation by reference to the record as are factual questions. *National Asphalt Paving Ass'n v. Train*, 176 U.S.App.D.C. 296, 304, 539 F.2d 775, 783 (1976). Thus, we scrutinize the instant broad policy decision only to determine whether the FPC acted arbitrarily and capriciously.

 Even though neither the APA nor the Natural Gas Act requires that procedures not prescribed by Section 553 be used in this rule making, we still must ask whether the agency abused its discretion by not using additional procedures. *See Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275, 1285–86 (9th Cir. 1973); *United Telegraph Workers v. FCC*, 141 U.S.App. D.C. 190, 195, 436 F.2d 920, 925 (1970). "[T]he Commission should 'realistically tailor the proceedings to fit the issues before it.'" *Mobil Oil Corp. v. FPC*, 157 U.S.App. D.C. 235, 249, 483 F.2d 1238, 1252 (1973). The petitioners challenge the procedural foundation of the orders on the ground that the FPC should not have denied the producers' persistent requests for a conference with the FPC's staff. The FPC replies that the notice and comment procedures amounted to a "conference on paper," and that nothing more was needed. We agree. We ordinarily will defer to an agency's choices concerning its procedures because in making such choices agencies are best situated to determine how they should allocate their finite resources. *See Wisconsin v. FPC*, 373 U.S. 294, 313–14, 83 S.Ct. 1266, 1277, 10 L.Ed.2d 357, 370 (1963).

 As we explained in *Alabama Ass'n of Insurance Agents v. Board of Governors of the Federal Reserve System*, 533 F.2d 224, 236–37 (5th Cir. 1976),

as partners with the agencies, in the effectuation of Congressional will through the administrative process . . . [the courts] do not function to strike down agency action because of merely formal or technical flaws. . . . [Citations omitted.] For this reason, a court must not only examine whether an agency's promulgation of a challenged regulation complies with the procedural requirement; it must also determine whether . . . any procedural flaw so subverts the process of judicial review that invalidation of the regulation is warranted.

Here, the producers have not explained why they were not able adequately to present their views through written comments or what they could have done by way of an oral conference with the staff that they could not have done without it. Under these circumstances, the agency need not come forward to explain why it chose not to grant one.

In sum, out review is under the arbitrary and capricious standard. The agency was not required to develop a substantial evidence record as would be required if we were presented with a factual finding. The procedures adopted were within the agency's proper discretion and were not shown to be insufficient.

C. Reasonable

 Because the order promulgating Form 64 originated in a policy decision of the agency and not as the outgrowth of factual determinations, the standard of review is whether the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1967). Under

---

**18.** Our decision is not inconsistent with *Mobil Oil Co. v. FPC*, *supra*, *Placid Oil Co. v. FPC*, 483 F.2d 880 (5th Cir. 1973), *aff'd sub nom. Mobil Oil Co. v. FPC*, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974), and *Shell Oil Co. v. FPC*, 520 F.2d 1061 (5th Cir. 1975) *cert. denied*, 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976). These cases involved rate making or the regulation of rates rather than policy decisions.

that standard we determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., supra,* 419 U.S. at 285, 95 S.Ct. at 442, 42 L.Ed.2d at 455. Our scope of review is narrow, *see Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. at 416, 91 S.Ct. at 824, 28 L.Ed.2d at 153, and we must defer to the FPC's exercise of its expertise, *see Permian Basin Area Rate Cases,* 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312, 336 (1968); *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333, 344 (1944).

The regulatory need for the data sought by Form 64 has not dissipated, as the petitioners contend, because the Ninth Circuit in *Union Oil* set aside the Orders adopting and implementing companion Form 40 (Orders Nos. 526 and 526–A). Although the FPC originally designed Form 40 and Form 64 for use with Form 45 as part of an integrated data collection system, the present unavailability of reliable reserve data by use of Form 40 does not destroy the value to rate making of Form 64, from which can be obtained valuable information about production, expenditures, and exploration and development activities.

Comparing this case with *Union Oil* underscores the reasonableness of the agency's actions. The GAO certified the proposed form for use, as required by the Federal Reporting Services Act, 44 U.S.C.A. §§ 3501 *et seq.* (1969 & 1977 supp.). But, most important, the FPC did not treat the objections raised against proposed Form 64 in a "summary" or "cursory" fashion as it did those raised against proposed Form 40 in *Union Oil.* 542 F.2d at 1037 & 1042–43. Rather, the FPC extensively altered its questionnaire to alleviate problems raised by producers. Among other things, the FPC (1) reduced the duration of the cost data series needed for trending from 10 to 5 years, (2) eliminated the requirement to report data on an area as well as a national basis, (3) eliminated the portion of Form 64 that overlapped with Form 40, (4) exempted producers whose annual production was at or under 250,000 Mcf, (5) granted additional time to file completed questionnaires, (6) modified the form in which data was to be reported for present and past years, and (7) altered its position on the availability of Form 64 data to the public.

The FPC did not change every feature of Form 64 that some producers found objectionable, nor respond to all of their suggestions and criticisms. It was not required to do so. *Cf. Portland Cement Ass'n v. Ruckelshaus,* 158 U.S.App.D.C. 308, 327, 486 F.2d 375, 394 (1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). The FPC's behavior does reflect a sensitivity to producer concerns. "[G]iven an essentially legislative task to perform, [the FPC] has carried it out in a manner calculated to negate the dangers of arbitrariness and irrationality." *Alabama Ass'n of Insurance Agents v. Board of Governors of the Federal Reserve System,* 533 F.2d 224, 237 (5th Cir. 1976), *quoting Automotive Parts & Accessories Ass'n v. Boyd,* 132 U.S.App.D.C. 200, 208, 407 F.2d 330, 338 (1968). Reasonableness requires no more.

### III. Compliance with the Federal Reporting Services Act

Superior argues that Order 543 violates the Federal Reporting Services Act, 44 U.S.C.A. §§ 3501 *et seq.* (1969 & Supp.1977), because the FPC announced that it would "not re-submit Form 64 annually as required unless it initiates changes in the form itself." This attack on the Order rests upon a misconception of the FPC's position. What the FPC actually said was:

While we recognize that this Form is subject to reclearance by the Comptroller General (GAO) pursuant to Section 3512(b) of Title 44 of the United States Code and GAO's implementing regulations,[9] we regard Form No. 64 as adopted by this order to be a permanent ongoing report form in furtherance of our statutory responsibilities under the Natural Gas Act. Accordingly, absent any Commission initiated changes in the form during the upcoming year, we do not propose in

any subsequent reclearance procedure to once again justify the necessity for the form and its reporting requirements.

[9] See 4 C.F.R. Section 10.11 (General Accounting Office), Renewals or revisions of existing plans and report forms.

We determine that the FPC meant to do no more than express its intention to take advantage of 4 C.F.R. § 10.11(a)(1) (1977), which streamlines the pre-clearance procedure by permitting agencies to incorporate by reference into their applications for renewal, material previously submitted to the GAO "to the extent that it is still current." Because the FPC referred to the portion of the GAO's regulations that deals with renewals or revisions of existing report forms, we assume that it is familiar with what is required [19] and did not intend to suggest that it would do anything less. Of course, if it is true, as the FPC represented during oral argument, that the GAO has amended its original clearance of Form 64 for one year of use to provide that the year shall not begin until this court has rendered its decision in this case, then the obligation to obtain pre-implementation approval may be regarded as already having been discharged for the forthcoming year.

### IV. Disclosure of the Data Collected by Form 64

The FPC's position on the disclosure of the data collected by Form 64 has changed markedly. The initial "Notice of Proposed Rulemaking" did not discuss the extent to which the information submitted by producers on the proposed questionnaire would be available for public inspection. In response to numerous expressions of concern about the dangers of unrestricted disclosure which it received in written comments, the FPC addressed the confidentiality problem in Order No. 543. There it announced that although it recognized that complete disclosure of the information submitted might prove detrimental to the interests of some producers, it had "determined that the public right to the information outweighs the [producers] proprietary interest [in non-disclosure]." In the ordering paragraphs of its opinion, the FPC went on to say: "Information filed pursuant to this order shall be made available at the Commission's offices for public inspection." The adoption of this explicitly wide-open disclosure policy provoked heightened criticism from producers. As a result, on petition for rehearing, the FPC softened its stance. It agreed to utilize the data yielded by Form 64 in composite or aggregate form "where appropriate." But it then went on to say:

> We shall also make Form No. 64 information public but shall delete the name of each independent producer from the heading. If there is need for the identification of any individual independent producer or group of independent producers, we shall consider that question when it arises in the context of a specific case.

Finally, in the ordering paragraphs of its opinion in Order No. 543–A, the FPC stated:

> Information contained in Form No. 64 shall be made public without further notice to the following extent only:
>
> > Composite or aggregate data or data submitted by any party, if his name and any information permitting identification by reference to other public records is deleted. *Continental Oil Company v. F. P. C.*, 519 F.2d 31 (5th Cir. 1975).

The petitioners object to the disclosure policy established by Order No. 543–A on the ground that since the data sought by Form 64 falls within exemptions (4) and (9) [20] of the Freedom of Information Act,

**19.** 4 C.F.R. § 10.11(a)(2) (1977) states:

> For plans or report forms for which the agency plans no revision, [the agency must] furnish a statement detailing the use made of previously collected information and explaining the circumstances which make continued use of the plan or report form necessary.

**20.** 5 U.S.C.A. § 552 (Supp.1976) provides:

> (a) Each agency shall make available to the public information as follows: . . .
> (b) This section does not apply to matters that are— . . . (4) trade secrets and commercial or financial information obtained from persons and privileged or confidential
> . . . . .
> (9) Geological or geophysical information and data, including maps, concerning wells.

that statute bars the FPC from making the data public. We think that this argument has been conclusively answered by our decision in *Pennzoil Co. v. FPC*, 534 F.2d 627, 629–31 (5th Cir. 1976), which held that "the mere fact that . . . information is encompassed within the exclusions of the Freedom of Information Act does not prohibit its disclosure." 534 F.2d at 632.

The petitioners seek to avoid the impact of our ruling in *Pennzoil* by suggesting that it is inconsistent with an earlier decision rendered by another panel of this court [21] which the *Pennzoil* panel was obliged to follow under this circuit's rule that one panel may not disregard an earlier decision by another. *See* Fed.R.App.P. 35; *Miller v. San Sebastian Gold Mine, Inc.*, 540 F.2d 807, 810 (5th Cir. 1976); *United States v. Lewis*, 475 F.2d 571, 574 (5th Cir. 1973). We are not required to reconcile *Pennzoil* with *Continental*. We adhere to the latest decision because the *Pennzoil* panel had before it the Supreme Court's decision in *Department of the Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), handed down after the decision in *Continental Oil*, to aid it in resolving this difficult question of statutory construction.[22] *Rose* dealt with whether the exceptions to the Freedom of Information Act prohibit agency disclosure of information falling within their terms. In describing the provisions and purposes of the Act, the Court stated:

> There are, however, exemptions from compelled disclosure. They are nine in number and are set forth in § 552(b). But these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.

The FPC concedes that Form 64 data would fall within these exemptions.

21. *Continental Oil Co. v. FPC*, 519 F.2d 31, 35 (5th Cir. 1975) *cert. denied sub. nom. Superior Oil Co. v. FPC*, 425 U.S. 971, 96 S.Ct. 2168, 48 L.Ed.2d 794 (1976).

22. The existence of a conflict among the circuits on the issue of whether agencies are prohibited from disclosing to the public material that Section 552(b)(1)(9) exempts from mandatory disclosure attests to the complexity of the issue. *Compare Westinghouse Electric Corp.*

425 U.S. at 361, 96 S.Ct. at 1599, 48 L.Ed.2d at 21. The *Pennzoil* panel quoted this remark, emphasizing the word "compelled," and relied upon it as authority for the proposition that "various statements of the Supreme Court strongly suggest that the statute is not an absolute bar to disclosure." *See* 534 F.2d at 630. *Rose* reaffirmed *Environmental Protection Agency v. Mink*, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), a case not mentioned in *Continental Oil* but cited repeatedly in *Pennzoil*, by quoting with approval its earlier statement that "[s]ubsection (b) . . . represents the congressional determination of the types of information that the Executive Branch must have the option to keep confidential, if it so chooses." 425 U.S. at 361, 96 S.Ct. at 1599, 48 L.Ed.2d at 21, *quoting Environmental Protection Agency v. Mink*, 410 U.S. at 80, 93 S.Ct. at 832, 35 L.Ed.2d at 128. In light of the Supreme Court's intervening decision in *Rose*, the *Pennzoil* panel's refusal to follow the decision in *Continental Oil* was fully justified.

Section 14 of the Natural Gas Act, 15 U.S.C.A. § 717m(a) (1976), authorizes the FPC to publish the information gathered in the course of discharging its regulatory responsibilities. But as we recognized in *Pennzoil* and as counsel for the FPC conceded during oral argument, disclosure of all or portions of such information might nonetheless be barred if the decision to make it public would constitute abuse of agency discretion. 534 F.2d at 631. In *Pennzoil*, we held that a decision to reveal confidential information to the public cannot withstand judicial scrutiny unless the FPC considers the following factors and explains

*v. Schlesinger*, 542 F.2d 1190, 1210–11 (4th Cir. 1976) (exemptions bar disclosure) *with Charles River Park "A", Inc. v. Dep't of Housing and Urban Development*, 171 U.S.App.D.C. 286, 292, 519 F.2d 935, 941 (1975) (exemptions do not bar disclosure).

We do not interpret *Pennzoil* to have modified *Continental Oil* except in its holding that the exemptions to the Freedom of Information Act enumerated in Section 552(b) prohibit agency disclosure of information which falls within their terms.

why they support its decision: (1) The extent to which disclosure will significantly aid the FPC in fulfilling its statutory functions; (2) the extent of the harm that disclosure might cause (a) producers, and (b) the public generally; and (3) the availability of alternatives to full disclosure that would adequately inform those who seek to knowledgably participate in the FPC's decision making process but would at the same time eliminate or mitigate the injury that unrestricted disclosure would cause to producers. 534 F.2d at 632. Because Orders Nos. 543 and 543–A were issued prior to delineation of the procedures set out in *Pennzoil*, we decline to remand Order No. 543–A to the FPC with directions that it now make the determinations that *Pennzoil* requires.

Insofar as Order No. 543–A permits public disclosure of data in composite or aggregate form, or in such a way that attribution of the information to individuals is not possible, it is affirmed. This type of disclosure reflects a reasonable balance of the producers' interest in secrecy and the public's right to know how they conduct their business. *See* Halverson, An Analysis of the Oil and Natural Gas Reserve Reporting Problem: The Government's Need to Know Versus the Private Company's Need to Protect the Confidentiality of its Sensitive Business Information, 27th Institute on Oil and Gas Law 119, 134 (1976); *cf. Continental Oil Co. v. FPC*, 519 F.2d at 36 (disclosure of data in composite or aggregate form does not violate the FOIA). In Order No. 543–A, the FPC also stated that it would make the completed questionnaires themselves available to the public after the names of the producers have been deleted, and might under some circumstances identify particular producers. The producers assert it would readily be possible to identify the individual producers furnishing the information from the configuration of responses on their questionnaires and the information given. Neither of these latter two types of disclosure gives those filing Form 64 the same degree of protection afforded by the disclosure of data solely in composite or aggregate form. Should the FPC determine that it should make completed questionnaires available for public inspection or disclose the identities of individual producers, it must first comply with the procedures prescribed by our decision in *Pennzoil*, then inform the producers involved of its determination, and finally, withhold publication of the data until the producers have had an opportunity to secure judicial review.

## V. Conclusion

The orders reviewed are modified to the extent indicated in the above paragraph and, as modified, are affirmed.

The stay order previously entered is dissolved.

STAY DISSOLVED.

ORDERS MODIFIED and AFFIRMED.